WATER TRANSPORT ASSOCIATION,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Association of American Railroads,
Intervening Respondent.

No. 81–1744.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1982.

Decided July 27, 1982.

Paul M. Donovan, Washington, D. C., with whom Samuel H. Moerman, Gerald L. Richman, and La Roe, Winn & Moerman, Washington, D. C., of counsel, were on the brief, for petitioner.

Edward J. O'Meara, Atty., I. C. C., Washington, D. C., with whom Robert S. Burk, Acting Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I. C. C.; and William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

R. Eden Martin, Washington, D. C., with whom David M. Levy, Michael G. Lederman of Sidley & Austin; and Thormund A. Miller, James R. Paschall, J. Thomas Tidd, Washington, D. C., of counsel, were on the brief, for intervening respondent.

J. Raymond Clark, Mary Todd Foldes, Washington, D. C., for intervening petitioner Central Illinois Light Company, et al.

Before WALD and MIKVA, Circuit Judges, and BONSAL,* Senior District Judge.

Opinion for the Court filed by Senior District Judge BONSAL.

BONSAL, District Judge:

On July 2, 1981, Water Transport Association ("WTA"), a trade association of domestic water carriers, filed this petition to review and set aside a decision of the Interstate Commerce Commission ("Commission") served on May 12, 1981, in Ex Parte No. 355—Cost Standards for Railroad Rates

---

* Of the United States District Court for the Southern District of New York, sitting by des-

ignation pursuant to 28 U.S.C. § 294(d) (1976).

(364 I.C.C. 898 (1981); JA 46).** The Association of American Railroads has intervened and filed a brief in support of the Commission. The Central Illinois Light Company, et al. have intervened and filed a brief in support of WTA. The Edison Electric Institute has also intervened in support of WTA but it has not filed a brief.

The Commission initiated Ex Parte No. 355 on October 11, 1978, following the passage by Congress of the Railroad Revitalization and Regulatory Reform Act of 1976 ("the 4R Act") (Pub.L.No.94–210; 90 Stat. 31 (1976)). Among the purposes of the 4R Act was to "foster competition among all carriers by railroad and other modes of transportation [and] to promote more adequate and efficient transportation services . . . ." (Section 101(b)(2)). To this end, Congress laid down certain standards for minimum and maximum rail rate regulation to "permit railroads greater freedom to raise or lower rates for rail services in competitive markets" without regulatory interference (Section 101(b)(3)). Ex Parte No. 355 deals only with rules for *minimum* rate regulation pursuant to the standard laid down in Section 202(b) of the 4R Act that rail rates that contribute to the "going concern value" of a railroad *may not be found* to be unreasonably low by the Commission. The 4R Act further provided that rates which exceeded "directly variable cost" were presumed to contribute to "going concern value," but that the presumption could be rebutted by clear and convincing evidence.

Ex Parte No. 355 was initiated by the issuance of a notice of proposed rulemaking (43 Fed.Reg. 45,877 (1978); JA 11). Describing Ex Parte No. 355 as a "proceeding to adopt formulas for determining the variable costs and the incremental costs of providing rail service," the notice proposed working definitions of various terms and requested comments from interested parties. Many interested parties filed comments in January and February of 1979, including WTA.

On July 9, 1980, the Commission served its first decision in Ex Parte No. 355 entitled "Cost Standards for Railroad Rates" (362 I.C.C. 800 (1980); JA 47), which outlined its proposed procedure for determining minimum reasonable rates. The decision included a provision that a rate which covers "directly variable cost" is presumed not to be unreasonably low and that "directly variable cost" includes only the line-haul cost of lading, applicable switching costs and station clerical cost (362 I.C.C. at 801; JA 47).

In its decision, the Commission considered the possibility of predatory pricing practices between rail, water and other methods of transportation and proposed that the "directly variable cost" test be used there also.

The Commission announced in its decision that it would be issuing a "revised notice of proposed rulemaking." On July 21, 1980 the notice appeared in the Federal Register entitled "Revised notice of proposed interpretation of statutory provisions." (45 Fed. Reg. 48,676 (1980); JA 64). It included a brief summary of the Commission's July 9, 1980 decision and requested comments by August 20, 1980.

Following motions to extend the time to file comments made by WTA and the Association of American Railroads, the Commission extended the time to file comments to September 19, 1980. On September 8, 1980 WTA moved for a further extension to October 20, 1980. In view of pending legislation (the Staggers Rail Act of 1980), the Commission extended the time to file comments to November 19, 1980, stating that "[s]uch an extension should allow the public sufficient time to prepare comments which take into account possible changes in existing law." (JA 79).

On October 1, 1980, the Staggers Rail Act of 1980 ("Staggers Act") became effective (Pub.L.No.96–448; 94 Stat. 1895 (1980)). The changes made by the Staggers Act included an amendment to the minimum rate provisions. The 4R Act had created a rebuttable presumption that rates exceeding "directly variable cost" contributed to

---

** "JA" refers to the Joint Appendix filed by Petitioner WTA on January 28, 1982.

"going concern value" and hence were not unreasonably low. The Staggers Act makes the presumption irrebuttable by providing that:

"A rate for transportation by a rail carrier that equals or exceeds the variable cost of providing the transportation is conclusively presumed to contribute to the going concern value of such rail carrier." (Section 201; 49 U.S.C. § 10701a(c)(2).)

Therefore, any rate which yields revenues that exceed the "directly variable cost" of providing the service cannot be set aside by the Commission as being unreasonably low. The Staggers Act requires the Commission to take final action on a complaint alleging unreasonably low rates within 90 days, and provides that the complainant has the burden of proof (49 U.S.C. § 10701a(c)(3)(A) and (B)).

Section 707 of the Staggers Act insures that the amendments made by it to the Interstate Commerce Act do not change existing law governing rates or practices which are predatory or destructive of competition between railroads and water carriers. Section 707 provides:

"With respect to the relationship between water carriers and rail carriers, none of the amendments made by this Act shall be construed to make lawful (1) any competitive practice that is unfair, destructive, predatory, or otherwise undermines competition and that was unlawful on the effective date of this Act, or (2) any other competitive practice that is unfair, destructive, predatory or otherwise undermines competition."

On October 28, 1980, WTA filed a motion to discontinue Ex Parte No. 355 (JA 80) on the ground that, in view of the Staggers Act, the Commission's existing notice no longer properly referenced "the legal basis for the proposed rule" (JA 85). WTA's motion was denied by decision issued November 17, 1980 on the ground that the Staggers Act changes "are not significant enough to affect the validity of our notices," and that the extension of the comment period was sufficient to enable the public to prepare comments that take into account changes in the law (JA 86).

On December 12, 1980, WTA again moved for issuance of an "Adequate Notice of Proposed Rule Making" in which it cited Section 707 of the Staggers Act, suggesting that it was an "entirely new section which affects the minimum rate provisions where rail-water competitive relationships are concerned . . . ." (JA 285, 288). WTA argued that the Commission wrongfully concluded that Section 707 had no "significant" impact on the Ex Parte No. 355 proceeding and contended that it was entitled to notice and an opportunity to comment on the Commission's conclusion.

In its final decision served May 12, 1981 (364 I.C.C. 898 (1981); JA 301), the Commission reiterated its position that the Staggers Act amendments were not significant enough to affect the validity of its notice, noting that the comment period had been extended to permit comment on the Staggers Act changes, and observing that other parties had addressed comments with respect to those changes. The Commission pointed out that WTA had acknowledged in its first motion that it had actual notice of the Staggers Act changes. Therefore, WTA had every opportunity to comment but had not chosen to do so. Accordingly, the Commission denied WTA's motion of December 12, 1980.

After consideration of the Staggers Act amendments and the comments received after its July 1981 decision, the Commission, in its final decision, set forth standards governing the minimum level of rail rates. It redefined "directly variable cost" as "the sum of those costs that actually vary directly with the level of transportation provided under the proposed rate" and adopted the term "presumptive cost floor" to apply to those costs that always vary with the level of traffic (the line-haul cost of lading, applicable switching costs, and applicable station clerical cost) (364 I.C.C. at 901; JA 303). The Commission ruled that rates which exceed "directly variable cost" will be conclusively presumed to contribute to going concern value, and thus will be found reasonable. Rates which exceed the "presumptive

cost floor" will be presumed to exceed "directly variable cost," but a complainant may rebut this presumption by showing that the "directly variable cost" for a particular movement includes cost elements other than those included in the "presumptive cost floor" (364 I.C.C. at 906; JA 305).

The Commission concluded that the possibility of harmful predatory pricing as a result of its decision was *de minimis,* and that "the procedural safeguards offered by our protest standards are adequate to guard against such minimal danger as might exist" (364 I.C.C. at 904). The Commission did not differentiate between water carriers, such as the members of WTA, and other types of carriers, and provided that the protest standards for minimum rate cases apply to all carriers equally.

On July 2, 1981, WTA instituted this action to review the Commission's decision.

WTA contends that Ex Parte No. 355 involved rule making and, as a consequence, the Commission failed to comply with the notice provisions of the Administrative Procedure Act ("APA") (5 U.S.C. § 553(b)). WTA further contends that the rules laid down by the Commission in its decision of May 12, 1981 failed to take into consideration Section 707 of the Staggers Act.

The Commission agrees with WTA that the proceeding involved rule making but denies that the revised notice failed to comply with the APA and contends that it considered Section 707 of the Staggers Act in reaching its final decision.

WTA points out that the Commission's revised notice of July 21, 1980 was labeled "Revised notice of proposed interpretation of statutory provisions" and did not inform the public that the Commission intended to propose binding rules. Section 4 of the APA specifies the contents of a notice issued by an administrative agency with respect to proposed rule making. It provides in pertinent part:

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." (5 U.S.C. § 553(b).)

■ We have held that Section 4 requires a notice which "affords interested parties a reasonable opportunity to participate in the rulemaking process." *Forester v. Consumer Product Safety Commission,* 559 F.2d 774, 787 (D.C.Cir.1977) (citations omitted); *Logansport Broadcasting Corp. v. United States,* 210 F.2d 24, 28 (D.C.Cir.1954). We agree with WTA that the revised notice of July 21, 1980 was deficient in failing to include in its title that rule making was involved. The Commission should have corrected the notice to show this. However, taking the Ex Parte No. 355 proceeding as a whole, including the text of the notice of October 11, 1978, the decision of July 9, 1980, the full text of the revised notice of July 21, 1980 and the comments subsequently received, we find that the public fully understood that the purpose of the proceeding was to formulate rules governing minimum rail rates. Thus, WTA and other interested parties had a "reasonable opportunity to participate in the rulemaking process." *Forester v. Consumer Product Safety Commission, supra.*

We have held that the substance of the notice, not its title, determines its adequacy. *See Nader v. Civil Aeronautics Board,* 657 F.2d 453, 455 (D.C.Cir.1981) and *Guardian Federal Savings and Loan Ass'n v. Federal Savings & Loan Insurance Corp.,* 589 F.2d 658, 666 (D.C.Cir.1978). Here, the text of the notice indicates that the Commission was proposing substantive binding rules to be used in the determination of reasonable minimum rail rates. Moreover, WTA had actual notice that this was a rule making proceeding. Indeed, in two of its motions it

referred to the proceeding as a rule making proceeding (JA 80, 285). Therefore, we conclude that the revised notice of July 21, 1980 complied with the APA, but, as we have said, we believe that in the future the Commission should be more careful of the titles it gives its notices. Since WTA knew that this was a rule making proceeding and was invited to comment and failed to do so, it cannot now question the adequacy of the notice.

■ WTA contends that the rules issued in Ex Parte No. 355 failed to take into account Section 707 of the Staggers Act and therefore should be set aside. WTA finds Congressional intent expressed in the following passage from the House Conference Report:

"The provision contained in this section, which qualifies each provision of each section of this Act, is designed to make clear that none of the provisions of the Act modifies existing law to make lawful a rate or practice that was unlawful on the day prior to enactment. Also the Conferees intend that this section allow water carriers to challenge practices that were unlawful as unfair, destructive, predatory, or otherwise undermined competition prior to enactment of this Act. In addition, of course, the Conferees do not intend to limit the rights of water carriers to exercise their rights and remedies under the provision of the Interstate Commerce Act as amended by the Staggers Act of 1980 regardless of whether those rights and remedies are related to practices which are unfair, destructive, predatory or otherwise undermine competition.

"The intent is that none of the amendments made by this Act is to be used to legitimize the undermining of rail-water competition. Railroad rates and practices that affect rail-water competition that are unfair, destructive, predatory, or otherwise undermine competition, and that were unlawful immediately prior to enactment of this Act shall continue to be prohibited. Similarly, no change made by this Act makes lawful any other railroad rate or competitive practice that is unfair, destructive, predatory or otherwise undermines competition." (H.R.Rep.No. 1430, 96th Cong., 2d Sess. 142–43 reprinted in [1980] U.S.Code Cong. & Ad.News, 4110, 4174–75.)

Since the rules laid down in Ex Parte No. 355 apply to minimum competitive rates between rail and other forms of transportation, WTA contends that under Section 707 a rail rate may still be challenged if it is unfair, destructive, predatory or because it would otherwise undermine rail-water competition even though it complies with the rules set forth in Ex Parte No. 355.

Section 707 of the Staggers Act preserved existing law with regard to unfair, destructive or predatory pricing practices. Recognizing this, the Commission's final decision discussed the possibility of harmful predatory pricing under the rules proposed in Ex Parte No. 355 and concluded that the danger was de minimis. (364 I.C.C. at 904; JA 305). The Commission also noted that in enacting the Staggers Act, Congress had determined that rates meeting the minimum standards of the Act were not, by virtue of their level, to be found illegal (id.).

We agree with the Commission's reading of the Act. Under the Act, a rate which contributes to "going concern value" cannot be unfair, destructive, predatory or otherwise undermining of competition because of the level at which it is set. It may, however, be otherwise illegal, if, for example, it was set collusively. WTA is not being denied the opportunity to so contend in the future. In the event that WTA should believe that it is being victimized by practices of railroads which are unfair, predatory or which otherwise undermine competition between rail and water carriers, it may file a complaint with the Commission or take such other action as it may be advised. Indeed, Section 707 is designed to preserve existing law governing unfair, destructive or predatory competition between railroads and water carriers. In addition, WTA could seek relief under the antitrust laws.

In view of the foregoing, the Commission's decision in Ex Parte No. 355—Cost

Standards for Railroad Rates (364 I.C.C. 898 (1981) is AFFIRMED.